IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALAN BILTHOUSE and PATRICIA BILTHOUSE, | )<br>)<br>) |
| Plaintiffs, | ) Case No. 05 c 4442<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Alan Bilthouse ("Bilthouse") and Patricia Bilthouse (together with Bilthouse, "Plaintiffs") bring this action against the United States of America (the "Government" or "United States") in order to recover refunds for overpayment of income taxes for tax years 1994 through 1999. In 1993, Bilthouse purchased stock in S&E Contractors, Inc. ("S&E"), a Florida S corporation, for $500,000.00. Bilthouse contends that his S&E stock became worthless in 1997, resulting in a complete disposition of his interest in the stock under 26 U.S.C. § 165(g). Bilthouse attempted to take advantage of that purported complete disposition by filing amended tax returns in 2001 for tax years 1994 through 1999. Bilthouse argues that his tax basis in his S&E stock increased to $5,130,610.00 in 1997 when S&E realized cancellation of indebtedness income in that year in the amount of $20,627,575.00. Bilthouse contends that the increase in tax basis, coupled with the complete disposition of his interest in S&E that occurred when the stock became worthless, allowed him to amend his tax returns to deduct over $5,000,000.00 in accumulated disallowed passive losses allocated to him by S&E over a number of years. The Government argues that

Plaintiffs' claimed deductions are not allowable because, Bilthouse's S&E stock became worthless in 1995, and not in 1997.

Now before this Court are Motions for Summary Judgment filed by Plaintiffs and by the Government. Because the Court finds that Plaintiffs have failed to meet their burden to establish that Bilthouse's S&E stock became worthless in 1997 and not at some point before 1997, Plaintiffs' Motion for Summary Judgment is denied. Because the Government has demonstrated that Bilthouse's S&E stock was worthless at least as early as 1995, the Government's Motion for Summary Judgment is granted.

### STATEMENT OF FACTS[1]

In March of 1993, Bilthouse became a shareholder in S&E, a Florida S corporation, by purchasing a number of shares for $500,000.00. (Bilthouse 56.1 ¶¶ 3, 5, 6.) By 1997, Bilthouse's shares represented a 25% ownership interest in S&E. *Id.* at ¶ 7.

---

[1]The facts are presented in the parties' statements pursuant to Local Rule 56.1. With respect to Plaintiffs' Motion, Plaintiffs' Statement of Undisputed Material Facts is cited as "Bilthouse 56.1 ¶ __"; Defendant's Response is cited as "Govt.'s Response ¶ __"; Defendant's Statement of Additional Facts is cited as "Govt.'s 56.1(b)(3)(C) ¶ __"; and Plaintiffs' Response thereto is cited as "Bilthouse Resp. to Add'l Facts ¶ __". With respect to Defendant's Motion, Defendant's Statement of Undisputed Material Facts is cited as "Govt.'s 56.1 ¶ __";Plaintiffs' Response is cited as "Bilthouse Response ¶ __"; Plaintiffs' Statement of Additional Facts is cited as "Bilthouse 56.1(b)(3)(C) ¶ __"; and Defendant's Response is cited as "Govt.'s Resp. to Add'l Facts ¶ __".

Plaintiffs have responded, in large part, to Defendant's Statements of Facts only with motions to strike. Plaintiffs have moved to strike the majority of Defendant's fact paragraphs, on one or more of the following grounds: (1) the paragraph does not comply with Local Rule 56.1 to the extent that it is not a short statement, but instead is a lengthy one; (2) the statement contains inadmissible hearsay; (3) the affidavit supporting the statement is not based on personal knowledge; and (4) the statement is based on documents that have not been properly authenticated. As the Court has previously advised the parties that it would, the Court has examined Defendant's statements, considering the parameters of Fed. R. Civ. P. 56 and Local Rule 56.1, and has not considered any inadmissible material. To the extent the Court finds any of Defendant's facts to be properly supported by admissible evidence and Plaintiffs have responded to those statements only with their Motion to Strike, those statements are deemed admitted. *See* L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")

S&E was a heavy construction contractor in the business of performing municipal public works projects for the State of Florida and for its cities and counties. *Id.* at ¶8. In order to bid on such projects, S&E was required to obtain construction bonds. *Id.* at ¶ 9. From 1991 through 1997, S&E worked with two bonding companies – Fireman's Fund ("Fireman's") and Safeco Insurance Company ("Safeco") – to obtain such bonds.

S&E began operations in the early 1980's. (Bilthouse 56.1 ¶ 3; Govt.'s Response ¶ 3.) Despite having approximately $40 million in annual revenues by 1994, S&E reported positive income on its tax returns in only two years during the period 1992 through 1997. (Bilthouse 56.1 ¶ 4, Govt.'s Response ¶ 3; Govt.'s 56.1 ¶8; Bilthouse Response ¶ 8.) S&E reported positive income in 1994 in the amount of $145,111.00 and in 1997 in the amount of $1,612,765.00. (Govt.'s 56.1 ¶ 8; Bilthouse Response ¶ 8.) However, the positive income reported on S&E's tax returns in those years was dwarfed by the losses reported in 1992 ($2,221,130.00), 1993 ($1,046,923), 1995 ($18,377,151), and 1996 ($4,786,574). *Id.* The loss reported in 1995 corresponds, at least chronologically, to a fifteen month period, running from April 1994 to June 1995, during which S&E suffered millions of dollars in losses as a result of cost overruns on a large construction project for the City of Jacksonville (the "North Landfill Project"). *Id.* at ¶ 16.

S&E's former president and majority shareholder, Douglass Ebbers ("Ebbers") testified that S&E became financially insolvent in 1995. (Govt.'s Resp. to Add'l Facts ¶ 31; Govt. Exh. 46, p. 217:1-13; Govt. Exh. 45, p. 6:17-19.) Karen Price ("Price"), the accountant who prepared tax returns for S&E during the years at issue in this lawsuit, testified that she explained to Ebbers with respect to S&E's financial woes, that "being insolvent is basically the excess of liabilities over assets and the ability to pay." (Govt.'s 56.1 ¶ 22.) In 1995, S&E defaulted on its bonds and it became

3

necessary for S&E to rely upon its bonding companies to finance the completion of its bonded contracts. (Bilthouse 56.1 ¶ 17.) In that same year, as a result of S&E's default, Fireman's and Safeco exercised their contractual rights to take control over the revenue from S&E's open projects, leaving S&E with a restricted cash flow. *Id.* at ¶ 20. In the fall of 1995, both bonding companies stopped issuing bonds to S&E for new public construction projects – the business from which it derived its revenues. (Bilthouse 56.1(b)(3)(C) ¶ 10.) Moreover, Dean Akers ("Akers"), who was engaged by S&E as a consultant in the spring of 1995 and became its president later that year, testified – via an affidavit submitted by the Government – that at the time he became involved with S&E the decision had already been made not to bid on any more bonded work. (Govt. Exh. 47 ¶¶ 3-6.) However, Akers further testified – via an affidavit submitted later by the Plaintiffs – that S&E intended to stop seeking new government projects only temporarily, until it could obtain new bonding. (Pltfs.' Exh. D to Bilthouse Resp. ¶ 24.)

Also in the fall of 1995, S&E filed a lawsuit against the City of Jacksonville, Florida related to the North Landfill Project (the "NLP Suit"). (Bilthouse 56.1 ¶ 36.) Plaintiffs contend that the NLP Suit supported recovering approximately fifteen to twenty-seven million dollars in damages, which, they contend, would have been sufficient to repay the bonding companies and allow S&E to resume obtaining new bonding for new public construction projects. (Bilthouse 56.1(b)(3)(C) ¶¶ 3, 14.) However, the original contract amount on the North Landfill Project was approximately $12 million and S&E was approximately halfway through the job when it ceased work on the project. (Govt. Exh. 46, p. 263:15-22.) The NLP Suit was settled in 1997 with neither S&E, nor either bonding company, receiving any money from the settlement. (Bilthouse 56.1(a)(3) ¶ 8.) Plaintiffs contend that the settlement of the NLP Suit in 1997 was "extremely significant because the future

4

of S&E hinged on receiving a significant recovery . . . because, without any settlement money, the two bonding companies could not be repaid for the costs they incurred to complete [S&E's] open projects." *Id.* at ¶¶ 39-40. It is undisputed that S&E was financially insolvent in 1997.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This standard applies when cross motions for summary judgment are filed, as they have been in this case. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court is "not required to draw every conceivable inference from the record and mere speculation or conjecture will not defeat a summary judgment motion." *Cont'l Cas. Co.*, 427 F.3d at 1041 (internal quotations and citations omitted). Moreover, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56

demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party. *Brewer v. Bd. of Trs.*, 479 F.3d 908, 915 (7th Cir. 2007).

## DISCUSSION

### I. Burden of Proof.

A plaintiff seeking a refund of taxes has the burden of proving that he is entitled to a refund. *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932) ("The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him."). In addition to proving entitlement to a refund, the taxpayer also bears the burden of proof with respect to the amount of the claimed refund. *United States v. Janis*, 428 U.S. 433, 440 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover. It is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects."). Accordingly, in this case, Plaintiffs bear the burden of establishing, by a preponderance of the evidence, both that they are entitled to a refund and also the amount of any refund they hope to recover.

### II. Applicable Law

Under 26 U.S.C. § 1366(a)(1)(A), for the purposes of determining the tax for a taxpayer who is a shareholder in an S corporation, the corporation's losses and deductions pass through directly to its shareholders in their pro rata shares and are taken into account on the shareholder's personal tax return. "However, a shareholder cannot take corporate losses and deductions into account on his personal tax return to the extent that such items exceed his basis in the stock and debt of the S

corporation." *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001) (citing 26 U.S.C. § 1366(d)(1)). "If those items exceed the basis, the excess is 'suspended' until the shareholder's basis becomes large enough to permit the deduction." *Id.* at 210 (citing 26 U.S.C. § 1366(d)(1)(2)).

Under 26 U.S.C. § 1367(a)(1)(A), shareholders are permitted to increase their corporate bases by items of income identified in § 1366(a). In 2001, the United States Supreme Court held in *Gitlitz* that cancellation of indebtedness income of an insolvent S corporation, although exempt from taxation to the shareholders, is an item of income under § 1366(a) that flows through to the shareholders of the S corporation and increases the tax basis in their stock. 531 U.S. 206. Accordingly, discharge of indebtedness income may be used to increase a shareholder's basis in the stock of an insolvent S corporation to allow the shareholder to take advantage of suspended corporate losses.

For passive investors like Bilthouse – those who have invested in a business in which they do not "materially participate" – corporate losses from an S corporation allocated to the investor under 26 U.S.C. § 1366 are subject to the passive activity loss rules set forth at 26 U.S.C. § 469. Under section 469, such losses – passive activity losses – ordinarily may be deducted only to the extent of passive income – corporate income passed through to the shareholder. *See* 26 U.S.C. § 469. However, such losses may also be available, in the event of a complete disposition of the passive activity, to offset other, ordinary income. With respect to the availability of corporate losses as a deduction against ordinary income, section 469 provides that such losses may:

> be deducted only to the extent the taxpayer has passive activity gains. Any remaining [passive activity loss] is suspended, and carried over to the next year, again becoming available to offset passive activity gains. *Only upon the disposition of the passive activity does the entire [passive activity loss]*, including the suspended [passive activity losses] from previous years, *become available as a deduction against* both passive activity gains and *other, ordinary income*.

7

*St. Charles Inv. Co. v. Commissioner*, 232 F.3d 773, 775 (10th Cir. 2000) (citing 26 U.S.C. § 469).

Title 26 U.S.C. § 165(g) provides, in pertinent part, that "[i]f any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall . . . be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset." Section 165 does not define "worthless," but courts have held that the worthlessness of a particular stock depends both upon its liquidating value and its potential value. In *Morton v. Commissioner*, 38 B.T.A. 1270, 1278-79 (1938), *aff'd* 112 F.2d 320 (7th Cir. 1940), the court held that:

> The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless.

A reasonable hope and expectation that the stock will become valuable at some future time – which hope and expectation precludes a finding of worthlessness – "may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it." *Id.* at 1278.

"This does not mean, however, that the taxpayer can himself fix the identifiable event [that establishes no hope of potential value] by selling for a nominal amount stock that had become worthless in a prior year." *Keeney v. Commissioner*, 116 F.2d 401, 402 (2d Cir. 1940) (citing *De Loss v. Commissioner*, 28 F.2d 803 (2d Cir. 1928)). "Nor can he postpone his claim of loss until only an 'incorrigible optimist' would fail to know that the stock had become worthless at an earlier date." *Id.* "The illusory hope [that an investment], proven unprofitable for years past, may some day prove valuable is not sufficient basis to postpone from year to year the cold fact of actual

8

worthlessness already reasonably established. Nor does the fact that in furtherance of such hope he may 'send good money after bad' and spends small sums periodically to keep the investment legally alive stay the operation of those economic laws which have brought about practical worthlessness." *Rickard v. Commissioner*, 15 B.T.A. 316, 318 (1929). In other words, "a 'mere hope,' or a 'remote hope' that there may be some recovery will not preclude [a finding of worthlessness.]" *United States v. Davenport*, 412 F. Supp. 2d 1201, 1207 (W.D. Okla. 2005) (citing *Halliburton Co. v. Commissioner*, 946 F.2d 395 (5th Cir. 1991)). "In cases where the stock has concededly lost any liquidating value in a certain year, but an event occurs in a subsequent year which the taxpayer claims is 'identifiable,' and where the Commissioner of Internal Revenue has determined that the stock became worthless in the year in which it lost its liquidating value, then the taxpayer, in order to be entitled to the loss deduction in the latter year, has the burden of proving that, although the stock lost its liquidating value in the prior year, it continued to have a potential value until the occurrence of the event." *Morton*, 38 B.T.A. at 1279.

### III. Plaintiffs' Claim for a Refund Must Fail Because No Reasonable Jury Could Find that their Stock in S&E Became Worthless in 1997 and Not Earlier than 1997.

As stated above, Plaintiffs bear the burden of establishing that they are entitled to a refund in this case. In order to meet that burden, Plaintiffs argue that they are entitled to increase the tax basis in their S&E stock by their pro rata share of $20,627,575.00 in cancellation of indebtedness income that they maintain S&E received in 1997.[2] The increase in basis would allow plaintiffs to take advantage of suspended passive losses they could not previously use due to insufficient basis.

---

[2]The Government does not concede that S&E received such cancellation of indebtedness income. However, it is not necessary for the Court do decide this issue because the issue of when Plaintiffs' stock in S&E became worthless is dispositive of Plaintiffs' claim for a tax refund.

9

*See* 26 U.S.C. § 1366(d)(1). Because Plaintiffs' seek to demonstrate their entitlement to a refund by applying those suspended passive losses against their ordinary income, they must demonstrate a complete disposition of their passive activity in 1997. *See* 26 U.S.C. § 469. Plaintiffs contend that such a complete disposition occurred in 1997, pursuant to 26 U.S.C. 165(g), because, they argue, their stock in S&E became worthless in that year. Because, on the record before this Court, no reasonable jury could find that Plaintiffs' stock in S&E became worthless in 1997 and not before then, Plaintiffs' claim for a refund must fail.

  A. <u>S&E Had No Liquidating Value in 1995.</u>

The Government has presented sufficient evidence to demonstrate that S&E had no liquidating value in 1995. Despite annual revenues of approximately $40 million, S&E reported losses totaling $26,431,778.00 on its tax returns in the years leading up to and including 1995. While S&E did report positive income of $145,111.00 in 1994, that income was heavily outweighed by the losses reported in 1992, 1993 and 1995.

According to S&E, it suffered millions of dollars in losses due to cost overruns between April 1994 and June 1995 on one specific project, the North Landfill Project. Thereafter, S&E defaulted on its bonds and was forced to seek the assistance of its bonding companies for financial support in order to complete work on its open bonded contracts. Whereupon, its bonding companies – Fireman's and Safeco – exercised their contractual rights to take control over the revenue from S&E's open projects, leaving S&E with a minimal cash flow. In the fall of 1995, both Fireman's and Safeco stopped issuing bonds to S&E for new public construction projects. Ebbers, S&E's majority shareholder and its former-president, has testified that S&E became insolvent in 1995.

For their part, Plaintiffs all but concede that S&E had no liquidating value in 1995. Indeed, aside from characterizing the Government's assessment of the liquidation value of S&E's stock in 1995 as "erroneous," Plaintiffs offer neither argument nor evidence that S&E had any liquidating value in 1995. (Pltfs.' Resp. to Govt.'s Mtn. for Summary Judgment at p. 2.) Plaintiffs' characterization of the Government's assessment of S&E's liquidation value, without more, cannot create a genuine issue of material fact with respect to the question whether S&E had any liquidating value in 1995. Accordingly, on this record, the Court finds that S&E became insolvent and had no liquidating value in 1995.

  B. <u>S&E Had No Potential Value in 1995.</u>

The Government has also provided sufficient evidence to demonstrate that S&E lacked any potential value in 1995. In 1995, S&E was insolvent and had been forced to turn to its bonding companies for financial assistance to complete its open projects. Further, those bonding companies had exercised their contractual rights to take control over the revenue from S&E's open projects (presumably to offset the expenses they were incurring in funding those open projects) and had decided not to issue any more bonds to S&E. Without such bonds, S&E could not engage in its business – performing municipal public works projects for the State of Florida and for its cities and counties – and thus there could be no hope that future revenue from its business would rescue S&E from insolvency. Not only was S&E prevented from engaging in its business because the bonding companies decided not to issue any more bonds to S&E, but Akers testified via affidavit that by the time he became affiliated with S&E in 1995, the decision had already been made that S&E was not

11

even going to be seeking any more bonded work.[3] With no hope of future revenues from its construction business, the Government argues, there can be no reasonable hope that S&E would emerge from its insolvency and, as such, the company had no potential value in 1995.

With respect to potential value in 1995, Plaintiffs point only to the hope of recovering 15 - 27 million dollars in the NLP suit. Plaintiffs contend that "the future of S&E hinged on receiving a significant recovery . . . because, without any settlement money, the two bonding companies could not be repaid for the costs they incurred to complete [S&E's] open projects." (Bilthouse 56.1(a)(3) ¶ 39-40.) Plaintiffs argue that because a substantial recovery in the NLP Suit would have allowed S&E to emerge from insolvency and once again seek bonded construction projects, S&E's potential value was not extinguished until the NLP Suit was settled in 1997 with no recovery for S&E.

But Plaintiffs – who have the burden of demonstrating that S&E had potential value in 1995 – have not provided this Court with any information about the NLP suit that would allow this Court to arrive at the conclusion that the hope of a recovery in that action provided a "*reasonable* hope and expectation that the assets will exceed the liabilities of [S&E] in the future." *Morton*, 38 B.T.A. at 1278-79 (emphasis added). That is to say, without knowing anything about the merits of the NLP suit, it is impossible to arrive at the conclusion that the hope of a recovery in that suit large enough to bring S&E out of insolvency was at all reasonable. Indeed, all the Court knows about that suit at this point is: (1) that the suit was related to the North Landfill Project; (2) that the original contract amount on the North Landfill Project was approximately $12 million; (3) that S&E was approximately halfway through the job when it ceased work on the project; and (4) that the suit was

---

[3]While Akers has also testified that S&E only intended to temporarily cease the pursuit of bonded work until it could obtain additional bonding, Plaintiffs have not pointed to any potential influx of cash – other than the NLP suit – that would have allowed that to happen.

settled in 1997 with S&E receiving no money from the settlement. If anything, those details suggest that the hope of a $15 - 27 million recovery was not reasonable at all and was, at best, a remote hope that cannot preclude a finding of worthlessness in 1995. *Davenport*, 412 F. Supp. 2d at 1207.

## **Conclusion**

For the reasons stated herein, the Government's Motion for Summary Judgment is Granted and the Plaintiffs' Motion for Summary Judgment is Denied. Plaintiffs' Motion to Strike Defendant's L.R. 56.1(b)(3)(B) Statement and its Motion to Strike Second Declaration of Barbara E. Seaman and Exhibits 90 and 93 are Granted in part and Denied in part, consistent with this Opinion.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: September 28, 2007